STATE of Wisconsin, Plaintiff-Respondent,

v.

Jerry J. MEEKS, Defendant-Appellant.†

Court of Appeals

*No. 01–0263–CR. Submitted on briefs December 4, 2001.— Decided February 5, 2002.*

2002 WI App 65

(Also reported in 643 N.W.2d 526.)

---

† Petition to review granted 4-22-02.

---

363

364

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Howard B. Eisenberg*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Eileen W. Pray*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Schudson, JJ.

¶ 1. SCHUDSON, J. Jerry J. Meeks appeals from the judgment of conviction for felony murder—armed robbery (habitual criminality), following his guilty plea and sentencing. He challenges the circuit court order, entered approximately six months before his guilty plea, concluding that he was competent to proceed.[1]

---

[1] The order was based on a decision by Judge Elsa C. Lamelas, who conducted the hearing to which Meeks makes most of his challenges here. The judgment, however, was entered by Judge Daniel L. Konkol, whose decision denying Meeks's request for an additional competency hearing also is challenged in this appeal.

¶ 2. Meeks argues that the circuit court, at the competency hearing, erred: (1) by considering his *prior* attorney's testimony, which, Meeks maintains, divulged privileged communications; (2) in evaluating his *trial* attorney's opinion of his competence; and (3) in considering the evidence in several other ways. Finally, Meeks argues that the circuit court erred in denying his request for an additional competency hearing before accepting his guilty plea and, again, before sentencing him.

¶ 3. We conclude that an attorney's testimony *on the subject of a client's competency* is admissible at a competency hearing and that, in this case, because *prior* counsel's testimony was relevant to Meeks's competency and did not divulge privileged communications, it was properly admitted. Further, we conclude that, in this case, the circuit court also properly considered *trial* counsel's view and all the other evidence, and reasonably concluded that Meeks was competent. Finally, we conclude that because Meeks offered nothing to show that his condition had changed between the time the circuit court found him competent and the time of his guilty plea and sentencing, he was not entitled to an additional competency hearing. Therefore, we affirm.

## I. BACKGROUND

¶ 4. On December 12, 1998, Meeks and two accomplices were charged, as parties to the crime, with felony murder, habitual criminality, resulting from their December 6, 1998 armed robbery and killing of Narinder Singh, the owner of a Milwaukee food store.[2]

---

[2] The supreme court, however, has explained that "[c]harging felony murder as a party to the crime is redundant and unnecessary" because "[a] person convicted of a felony as a party

On December 22, 1998, the date scheduled for Meeks's preliminary hearing, Meeks's attorney first raised the competency issue and asked for an examination. *See* WIS. STAT. § 971.13(1) (1997–1998)[3] ("No person who lacks substantial mental capacity to understand the proceedings or assist in his or her own defense may be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures."); *see also* WIS. STAT. § 971.14.[4]

---

to the crime becomes a principal to a murder occurring as a result of that felony." *State v. Oimen,* 184 Wis. 2d 423, 449, 516 N.W.2d 399 (1994). Therefore, to avoid confusion in felony murder cases, only the underlying felony, and not felony murder, should be charged as a party to a crime, if appropriate. *Id.*

[3] All references to the Wisconsin Statutes are to the 1997–1998 version unless otherwise noted.

[4] The provisions of WIS. STAT. § 971.14, relevant to the competency proceedings in Meeks's case, are:

(1) PROCEEDINGS. (a) The court shall proceed under this section whenever there is reason to doubt a defendant's competency to proceed.

(b) If reason to doubt competency arises after the defendant has been bound over for trial after a preliminary examination, or after a finding of guilty has been rendered by the jury or made by the court, a probable cause determination shall not be required and the court shall proceed under sub. (2).

(c) Except as provided in par. (b), the court shall not proceed under sub. (2) until it has found that it is probable that the defendant committed the offense charged . . . .

(2) EXAMINATION. (a) The court shall appoint one or more examiners having the specialized knowledge determined by the court to be appropriate to examine and report upon the condition of the defendant. If an inpatient examination is determined by the court to be necessary, the defendant may be committed to a suitable mental health facility for the examination period specified in par. (c), which shall be deemed days spent in custody under s. 973.155 [relating to sentence credit] . . . .

. . . .

(c) Inpatient examinations shall be completed and the report of examination filed within 15 days after the examination is ordered . . . .

. . . .

(e) The examiner shall personally observe and examine the defendant and shall have access to his or her past or present treatment records, as defined under 51.30(1)(b) [defining "treatment records"].

. . . .

(g) The defendant may be examined for competency purposes at any stage of the competency proceedings by physicians or other experts chosen by the defendant or by the district attorney, who shall be permitted reasonable access to the defendant for purposes of the examination.

(3) REPORT. The examiner shall submit to the court a written report which shall include all of the following:

(a) A description of the nature of the examination and an identification of the persons interviewed, the specific records reviewed and any tests administered to the defendant.

(b) The clinical findings of the examiner.

(c) The examiner's opinion regarding the defendant's present mental capacity to understand the proceedings and assist in his or her defense.

(d) If the examiner reports that the defendant lacks competency, the examiner's opinion regarding the likelihood that the defendant, if provided treatment, may be restored to competency within the time period permitted under sub. (5)(a).

. . . .

(e) The facts and reasoning, in reasonable detail, upon which the findings and opinions under pars. (b) to (dm) are based.

(4) HEARING. (a) The court shall cause copies of the report to be delivered forthwith to the district attorney and the defense counsel . . . .

371

(b) If the district attorney, the defendant and defense counsel waive their respective opportunities to present other evidence on the issue, the court shall promptly determine the defendant's competency and, if at issue, competency to refuse medication or treatment for the defendant's mental condition on the basis of the report filed under sub. (3) or (5). In the absence of these waivers, the court shall hold an evidentiary hearing on the issue . . . . At the commencement of the hearing, the judge shall ask the defendant whether he or she claims to be competent or incompetent. If the defendant stands mute or claims to be incompetent, the defendant shall be found incompetent unless the state proves by the greater weight of the credible evidence that the defendant is competent . . . .

(c) If the court determines that the defendant is competent, the criminal proceeding shall be resumed.

(d) If the court determines that the defendant is not competent and not likely to become competent within the time period provided in sub. (5) (a), the proceedings shall be suspended and the defendant released, except as provided in sub. (6) (b) [relating to discharge and civil proceedings].

**(5)** COMMITMENT. (a) If the court determines that the defendant is not competent but is likely to become competent within the period specified in this paragraph if provided with appropriate treatment, the court shall suspend the proceedings and commit the defendant to the custody of the department of health and family services for placement in an appropriate institution for a period of time not to exceed 12 months, or the maximum sentence specified for the most serious offense with which the defendant is charged, whichever is less. Days spent in commitment under this paragraph are considered days spent in custody under s. 973.155.

. . . .

(b) The defendant shall be periodically reexamined by the treatment facility. Written reports of examination shall be furnished to the court 3 months after commitment, 6 months after commitment, 9 months after commitment and within 30 days prior to the expiration of commitment. Each report shall indicate either that the defendant has become competent, that the defendant remains incompetent but that attainment of competency is likely within the remaining commitment period, or that the

372

¶ 5. On February 10, 1999, following a hearing at which the circuit court received a report from Dr. Gary J. Maier, a psychiatrist who had examined Meeks at the Mendota Mental Health Institute pursuant to the court's order, the court found that Meeks was not competent. The court then adjourned the hearing for a later determination of whether Meeks was likely to regain competency.

¶ 6. For the next eleven months, Meeks continued to receive treatment as well as additional evaluations from Dr. Maier and other psychiatrists and psychologists. During this time, in seven separate sessions between June 22, 1999 and January 3, 2000, the court conducted a competency hearing at which it considered numerous reports and extensive testimony from psychiatrists and psychologists who had examined Meeks. The court also heard testimony from: Assistant State Public Defender Mary Scholle, who had represented Meeks in criminal cases in 1994 and 1996–97; Sandra

---

defendant has not made such progress that attainment of competency is likely within the remaining commitment period. Any report indicating such a lack of sufficient progress shall include the examiner's opinion regarding whether the defendant is mentally ill, alcoholic, drug dependent, developmentally disabled or infirm because of aging or other like incapacities.

(c) Upon receiving a report under par. (b), the court shall proceed under sub. (4). If the court determines that the defendant has become competent, the defendant shall be discharged from commitment and the criminal proceeding shall be resumed. If the court determines that the defendant is making sufficient progress toward becoming competent, the commitment shall continue.

(d) . . . If a defendant who has been restored to competency thereafter again becomes incompetent, the maximum commitment period under par. (a) shall be 18 months minus the days spent in previous commitments under this subsection, or 12 months, whichever is less.

. . . .

Bucholtz, a probation/parole agent who had supervised Meeks in 1993–94; and Colleen Frey, a probation/parole agent who had supervised Meeks in 1996–97. Additionally, the court observed Meeks at the hearing and interacted directly with him when asking whether he would testify.

¶ 7. On January 4, 2000, following the completion of the hearing, the court presented a lengthy oral decision analyzing the evidence. The court accurately summarized the reports and testimony, acknowledged Meeks's history of mental health problems and his current cognitive limitations, recognized the many uncertainties reflected by the evidence, and noted the difficulty in discerning whether Meeks was malingering. Ultimately, however, the court determined that Meeks was competent to proceed.

## II. CHALLENGES TO THE COMPETENCY HEARING

¶ 8. To be competent to proceed in a criminal case, a defendant must be able "to understand the nature and object of the proceedings against him [or her], to consult with counsel, and to assist in preparing his [or her] defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975); *see also State v. Byrge*, 2000 WI 101, ¶ 27, 237 Wis. 2d 197, 614 N.W.2d 477. In Wisconsin, when competency is at issue, the circuit court must find a criminal defendant incompetent to proceed unless the State proves by the greater weight of the credible evidence that the defendant is competent. *See Byrge*, 2000 WI 101 at ¶ 30; *see also* Wis. Stat. § 971.14(4)(b).

¶ 9. These standards remain the same regardless of the stage of the criminal proceedings at which the

competency issue is raised. *Godinez v. Moran*, 509 U.S. 389, 397–99 (1993) (competency test is the same for purposes of determining defendant's capacity to stand trial, plead guilty, or waive counsel). Further, at any stage, the focus of the competency hearing is the defendant's capacity to understand the proceedings and assist in the defense at the time of the proceedings. *Byrge*, 2000 WI 101 at ¶ 31.

¶ 10. "The aims of a competency hearing are modest, seeking to verify that the defendant can satisfy the understand-and-assist test." *Id.* at ¶ 48.[5] A competency hearing is a judicial inquiry guided by the evidence and legal standard, not a clinical inquiry dictated by a medical diagnosis. *Id.* "[B]ecause a competency hearing presents a unique category of inquiry in which the circuit court is in the best position to apply the law to the facts," our review of the court's findings and conclusion is highly deferential. *Id.* at ¶ 4. We will uphold a circuit court's competency determination unless it is clearly erroneous, *see id.*; that is, unless it is totally unsupported by the record, *see State v. Garfoot*, 207 Wis. 2d 214, 224, 558 N.W.2d 626 (1997).

### A. Remoteness

¶ 11. Meeks first argues that the circuit court was "clearly wrong to decide that [he] was competent to stand trial" because it "gave greatest weight to the most remote evidence"—the testimony of Scholle, Bucholtz,

---

[5] We do not, however, interpret this language as suggesting that a circuit court, conducting a competency hearing, could fairly have any preconceived notion that would lead it to try to "verify that" a defendant is competent. Therefore, we read "verify that" to mean "determine whether."

and Frey, who had not had contact with Meeks for years preceding their testimony at the competency hearing. Meeks contrasts their testimony to that of the many mental health professionals, all of whom had recently examined him in order to offer their competency opinions. Meeks insists that the court based its conclusion "largely on the testimony of the lay witnesses, Mary Scholle, in particular." In a related argument, Meeks adds that the court "did not consider the possibility that [he] had become incompetent since the lay witnesses had contact with him."

¶ 12. Meeks's theory is clear: (1) the psychiatrists and psychologists opined that he was incompetent; (2) Scholle and the probation/parole agents suggested otherwise; (3) the court concluded that he was competent; and therefore (4) the court must have based that conclusion on the testimony of Scholle and the agents, all of which should have carried relatively little weight given the temporal remoteness of their contact with Meeks. Meeks's theory, however, does not fairly reflect either the testimony or the circuit court's analysis of the evidence. The record does not establish that the court based its determination of competency "largely on the testimony" of Scholle and the probation/parole agents. And the record does not reflect that the court improperly considered their testimony.

¶ 13. The circuit court recounted the various views of the psychiatrists and psychologists and their tentative conclusions and opinions. The court recognized that these professionals, for the most part, opined that Meeks was incompetent. The court also recognized, however, that some of them also expressed considerable doubt and questioned whether Meeks was malingering.

¶ 14. Understandably, therefore, the court looked to the additional evidence from Scholle and the agents and valued their testimony about their numerous contacts with Meeks, both in court and on probation/parole. Learning that Scholle and the agents had not considered Meeks incompetent at any time during their years of contact with him, the court fairly reasoned that the mental health professionals' testimony was "compromised by what they do not know, by their inability to perceive [Meeks] functioning outside of the mental health institution."

¶ 15. The court's consideration of the lay testimony was particularly appropriate in this case where, as appellate counsel concedes, Meeks "can relate facts regarding his crime and can even answer questions about the historical facts," but where, appellate counsel asserts, Meeks "has no comprehension or understanding of the legal process." Because the defense was seeking to establish that Meeks was too cognitively impaired to proceed, it was logical for the State to counter with evidence establishing that his mental condition had not changed since the time Scholle represented him and that, when she did so, Scholle deemed Meeks competent to proceed.

¶ 16. "Only the trial court can judge the credibility of witnesses who testify at the competency hearing," and weigh their testimony. *Garfoot*, 207 Wis. 2d at 223. Moreover, while "a competency inquiry focuses on a defendant's ability at the time of the *present* proceeding, not on the defendant's competency at some point in the distant past," *State v. Farrell*, 226 Wis. 2d 447, 454, 595 N.W.2d 64 (Ct. App. 1999), the defendant's past mental condition may be relevant to the present determination

of competency, *see id.*; *see also State v. Weber*, 146 Wis. 2d 817, 827, 433 N.W.2d 583 (Ct. App. 1988).

¶ 17. Here, unquestionably, the record reflects the court's careful consideration of all the evidence and its measured evaluation of the interplay between the opinions of the mental health professionals and the more remote information from the lay witnesses. *See Farrell*, 226 Wis. 2d at 455 ("The court considers *all* the factual evidence presented to it when determining whether a reason to doubt competency exists."). We see no error.

B. Prior Counsel's Character

¶ 18. Meeks also argues that the circuit court "improperly considered the character of [Ms. Scholle] when weighing the evidence." We disagree.

¶ 19. "A trial court sitting as fact-finder may derive inferences from the testimony and take judicial notice of a fact that is not subject to reasonable dispute, but it may not establish as an adjudicative fact that which is known to the judge as an individual." *State v. Peterson*, 222 Wis. 2d 449, 457, 588 N.W.2d 84 (Ct. App. 1998) (footnotes omitted). Here, the court's judicial notice was of undisputed facts, and its knowledge of Ms. Scholle had not been gained "as an individual," but rather, as a court, in its formal role.

¶ 20. Meeks did not object to—and still does not dispute—the court's comments about Ms. Scholle. The court observed that Ms. Scholle was "accustomed to dealing with people in the real world" and "ha[d] tried [a] case before [the court of a] mentally ill man, and . . . [was] . . . acutely conscious of the cultural milieu from which so many of her clients and the clients of the state

378

public defender's office come."[6] The court's observations were relevant to its explanation of why it was giving considerable credit to the fact that Ms. Scholle, in representing Meeks previously, had never deemed it appropriate to raise the competency issue.

¶ 21. Nevertheless, Meeks now contends that the court improperly considered Ms. Scholle's character. Meeks, however, cites no authority that supports his contention. *See* WIS. STAT. RULE 809.19(1)(e) & (3)(a) (appellate arguments must be supported by authority).

---

[6] Earlier in its decision, the court commented:

> I remember quite clearly a case that [Ms. Scholle] tried in front of me . . . . And one of the reasons that case is so memorable is that the defendant, while competent, was a person who had very serious mental health issues; and [Ms. Scholle] did an outstanding job in terms of handling him, and his circumstances, and making sure that he got a fair trial.

> [Ms. Scholle] testified that if there was any scintilla of doubt in her mind about a person's competency she would have brought that to my attention, and I think that's consistent with everything that I have known about her and everything that I have observed of her as an attorney over these many years. So I have really no doubt in my mind that if the defendant's cognitive limitations were such[, given] Ms. Scholle's experience and commitment, that if it had come to her notice, it would have been brought to my attention; and she did not.

> . . . .

> [Ms.] Scholle stated [at the 1997 plea hearing] that she had represented [Meeks] in 1994 . . ., that she remembered Mr. Meeks from that time, and that when she had spoken to him on the previous night, the night before the hearing, in jail, he had indicated to her that he was on medication, and so that she was aware of the fact that there were some mental health issues at that point.

The court also commented that Ms. Scholle was "a very hard worker" who was "one of the most able [assistant state public defenders] that we have in Milwaukee."

379

Moreover, Meeks offers nothing to suggest that a circuit court should only hear testimony from attorneys with whom it has no professional familiarity, or should not candidly reveal its knowledge of counsel's experience *when that experience is relevant to the competency determination.*[7] *See Peterson*, 222 Wis. 2d at 457 ("A trial court sitting as fact-finder may . . . take judicial notice of a fact that is not subject to reasonable dispute . . . .").

## C. Trial Counsel's Opinion

¶ 22. In a related argument, Meeks maintains that the circuit court "failed to consider the opinion of [his] trial counsel in this case." He asserts that the court "entirely discounted" his attorney's view such that "one might well conclude that the [c]ourt thought that [defense counsel] was either a liar or was incompetent for thinking that Meeks was not competent to stand trial."

¶ 23. We agree with Meeks's unstated premise—in almost all cases where competency is at issue, defense counsel is in a uniquely advantageous position to advise the court whether the defendant understands the proceedings and is able to assist in the defense. As Professor Uphoff observed:

> Defense counsel is in the best position to make informed, comparative judgments about a particular client's understanding of the proceedings against him.

---

[7] Needless to say, if counsel's credibility is at issue, and if the circuit court already holds an opinion on counsel's credibility, that opinion should be disclosed and recusal should be considered. Here, however, Ms. Scholle's testimony was undisputed; her *credibility* was not at issue; her *experience* was relevant.

Counsel is also in the best position to assess that client's ability to make the decisions required of the client and to provide whatever assistance counsel deems necessary.

Rodney J. Uphoff, *The Role of the Criminal Defense Lawyer in Representing the Mentally Impaired Defendant: Zealous Advocate or Officer of the Court?*, 1988 WIS. L. REV. 65, 87 (footnote omitted). Thus, not surprisingly, courts have concluded that defense counsel is duty-bound to accurately inform the court of his or her opinion of a client's competence. *See Bishop v. Superior Court*, 724 P.2d 23, 30 (Ariz. 1986) (holding, in part, that at retrospective hearing to determine whether defendant was competent when he pled guilty to first-degree murder, attorney who represented defendant at the time of the guilty plea was required to testify on the issue of whether the defendant was competent); *see also State v. Johnson*, 133 Wis. 2d 207, 210–11, 395 N.W.2d 176 (1986) (holding, in part, that where defense counsel has reason to doubt client's competency, counsel must raise the issue, and failure to do so constitutes ineffective assistance).

¶ 24. Thus, a careful court will recognize the singular value of counsel's opinion and carefully consider it, in light of all the evidence at a competency hearing. Here, however, Meeks points to nothing in the record to substantiate his contention that the circuit court "entirely discounted" trial counsel's opinion. *See* WIS. STAT. RULE 809.19(1)(e) & (3)(a) (appellate arguments must be supported by record references). Indeed, the opposite impression emerges from the record; the court frequently interrupted defense counsel's closing argument at the competency hearing in an apparently

genuine effort to question, develop and consider counsel's view of the evidence.[8]

---

[8] Moreover, in his closing argument, Meeks's trial counsel conceded that the case was "very, very difficult," "complicated," and "troublesome" in many respects. He expressed his opinion with at least a hint of equivocation. Counsel stated, "And I would submit to you that Mr. Meeks is unable to function in critical areas, mainly his ability to abstract on a sufficient level to understand what's going on, to really understand what a murder charge is." He then went on to specify that Meeks did not understand "felony murder" or "such basic things as what 60 years in prison means, other than it's a long time," and "what a decent plea bargain is." Counsel then concluded, in part:

> You know, I am not saying that any one of these [areas of lack of understanding] is enough to push him over the edge, but what I think [they are] indicative of is a lack of understanding, of [sic] lack of abstracting ability. It makes it difficult for him to understand what's going on.

Nor does appellate counsel claim that Meeks is obviously or unequivocally incompetent. In his brief to this court, counsel comments:

> Mr. Meeks does not present the usual picture of a mentally deficient individual. He can relate facts regarding his crime and can even answer questions about the historical facts. The problem is that he has no comprehension or understanding of the legal process. He lacks the intellectual capacity to make decisions regarding the case, such as whether to go to trial or accept a plea, whether to testify, what defenses to raise, or whether to appeal.

We offer these observations not to suggest that either trial counsel or appellate counsel presented a legally inadequate argument; indeed, we agree that the case was a "very, very difficult" one and, based on the "complicated" evidence, the circuit court could well have come to embrace defense counsel's position. We do, however, point to these comments, by both trial counsel and appellate counsel, for two important reasons: (1) they confirm the closeness of the circuit court's call; and (2) they further confirm the wisdom of the circuit court's decision to carefully consider the transcripts from some of Meeks's previ-

### D. Meeks's "Demeanor" in a Previous Case

¶ 25. Meeks argues that the circuit court improperly considered his "demeanor" from a case in which he had been the defendant before the same court several years earlier. Meeks maintains that, by doing so, the judge "was essentially testifying about her prior observations of [him] in another case, at another time." While conceding that such evidence was "probably relevant," Meeks asserts that it was impermissible under WIS. STAT. § 906.05. We disagree.

¶ 26. WISCONSIN STAT. § 906.05 states: "The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point." In this case, however, the judge did not testify. Rather, she summarized certain aspects of a 1997 hearing before her at which Meeks pled guilty to operating a vehicle without the owner's consent. In its decision determining that Meeks was competent, the court commented that it had "reviewed the record [of the 1997 plea hearing] with care," and noted that it was "devoid of any indication that either Ms. Scholle or myself questioned Mr. Meeks'[s] ability to understand the proceedings at that time."[9]

---

ous court appearances, together with the testimony from Ms. Scholle and the probation/parole agents, in order to evaluate whether, in fact, Meeks could understand the legal process.

[9] In its decision determining competency, the court also commented on the 1997 plea proceeding, offering observations that shed additional light on several of the issues in this appeal:

> I think that I am fairly cautious[,] generally speaking[,] as a matter of habit about raising the issue of competency, as well as language needs, independently[,] if it appears to me during the progress of a hearing that the defendant is having any difficulty responding, appears confused, reluctant, unable to understand.

■

¶ 27. As Meeks all but concedes, his understanding of the 1997 legal proceeding was relevant to the court's determination of his competency to proceed in 2000. The judge did not testify, but did carefully consider the transcribed record and her recollection of the 1997 proceeding. That was proper. We see no substantive difference between a judge's observations of a defendant's demeanor at the time competency is challenged and the judge's observations of the defendant at an earlier proceeding; both may be probative. *See Byrge*, 2000 WI 101 at ¶ 44 n.18 ("The circuit judge has a unique vantage [point] from which to make a competency determination because the judge has significant personal exposure to the defendant.").

### E. Privileged Communications

¶ 28. Meeks separately argues that the trial court erred in admitting Ms. Scholle's testimony because, he claims, it related attorney-client privileged communica-

[Meeks,] during the course of the [1997 plea] hearing[,] indicated that he was taking medications[;] however, [he] assured me that he was able to understand his defense attorney as well as the court.

Ms. Scholle also indicated during the course of that hearing that the defendant ... understood ... the charge against him, as well as his rights.

. . . .

Ms. Scholle told me during the course of that hearing that she had represented him in the past, so she had an opportunity to develop a relationship with the defendant and know him perhaps probably better than [in] the usual relationship between an attorney and client.

tions.[10] He submits that "regardless of the specific questions asked of [Ms. Scholle], her testimony regard-

[10] Although appellate counsel, in his brief to this court, claims that trial counsel "objected to the testimony of Ms. Scholle on both relevancy and privilege grounds," the record reveals that counsel's privilege-based challenge was tentative, at best.

First, *the prosecutor* alerted the court that "there is [sic] some potential client privilege issues here as Ms. Scholle essentially is here because she represented Mr. Meeks on prior occasions." Then, before Ms. Scholle took the witness stand, *the prosecutor* stated, "I don't know how Mr. Meeks would ever be able to knowingly, voluntarily, intelligently waive that [attorney-client] privilege when it's his contention he is incompetent to go ahead with trial." Then, after the court commented that "[i]f we don't need to reach that issue [of privilege and waiver], we won't," the prosecutor advised the court that he did not think privilege and waiver would become issues. The prosecutor explained, "I have agreed with Ms. Scholle and [her lawyer,] Mr. Tyroler[,] to essentially limit my questions to what I believe are questions that would not in any way call upon Ms. Scholle to violate any lawyer client privileges that Mr. Meeks may have with regard to her representation of him previously." Defense counsel then responded, "Your Honor, I would still object to this witness *on relevancy grounds.*" (Emphasis added.)

Next, still before Ms. Scholle took the stand, defense counsel, anticipating that the prosecutor was "going to submit a transcript of the last proceeding that Mr. Meeks was involved in," commented: "That transcript speaks for itself. I don't know what Ms. Scholle could add to the situation that would not impinge upon Mr. Meeks'[s] privilege."

During Ms. Scholle's testimony, defense counsel objected to only one question on the basis of what he termed, "perhaps privileged conversation." The question was: "Do you recall whether or not, when you represented Mr. Meeks . . . you were aware of his criminal history?" The court overruled counsel's

ing [his] mental status necessarily involved the revelation of information conveyed to her by her conversations with [him]." We disagree.

¶ 29. On direct examination by the prosecutor, Ms. Scholle first testified, generally, about her fifteen years as an assistant state public defender and, somewhat more specifically, about her education and experience relative to the representation of defendants whose competency might be at issue. She then testified briefly about her representation of Meeks on two separate occasions, involving three cases, between 1994 and 1997. That portion of Ms. Scholle's testimony was presented in conjunction with the introduction of certain transcripts and portions of the records from those cases. Finally, on direct examination, Ms. Scholle testified that she had represented Meeks on a misdemeanor case in which he pled guilty pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970), and she commented, generally, on how she "approached the concept of an *Alford* plea with a client."

¶ 30. Cross-examining Ms. Scholle, defense counsel asked no questions about her representation of Meeks, never even mentioning him. He did, however, ask a few questions regarding whether "sometimes it is difficult for [her] to decide whether or not to raise competency particularly with [clients who may have] cognitive disabilities." The court then briefly questioned Ms. Scholle, asking about her practices in using guilty plea questionnaires and whether, with respect to a specific section on such questionnaires dealing "with mental illness or incompetence," it was her practice "to inquire about that" when a client had "a history of

---

objection; Ms. Scholle answered, "I don't recall specifically." On appeal, Meeks does not challenge the court's ruling on that question.

mental illness." Defense counsel also asked a few more questions, following up on the court's inquiries. Neither the court's questions nor counsel's follow-up questions, however, specifically referred to Meeks.

¶ 31. Meeks presents authorities standing for the proposition that counsel should not be allowed to testify on the issue of competency because, inevitably, counsel's opinions and conclusions are based on privileged communications. The State counters with authorities supporting the view that counsel may testify at a competency hearing without violating the privilege. As the State also acknowledges, however, "the acceptable limits of attorney testimony at competency hearings appears to be a question of first impression in this state."

¶ 32. WISCONSIN STAT. § 905.03(2), Wisconsin's attorney-client privilege, in relevant part provides:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client: between the client or the client's representative and the client's lawyer or the lawyer's representative; or between the client's lawyer and the lawyer's representative; or by the client or the client's lawyer to a lawyer representing another in a matter of common interest; or between representatives of the client or between the client and a representative of the client; or between lawyers representing the client.

Further, a communication is "confidential" if it is "not intended to be disclosed to 3rd persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." WIS. STAT. § 905.03(1)(d). Under the unusual cir-

387

cumstances of this case, we will assume, without deciding, that Meeks, through his attorney at the competency hearing, properly invoked the privilege in relation to his communications with Ms. Scholle.[11]

¶ 33. The party asserting the attorney-client privilege bears the burden to establish that the privilege applies. *See Franzen v. Children's Hosp. of Wis., Inc.*, 169 Wis. 2d 366, 386, 485 N.W.2d 603 (Ct. App. 1992). The privilege must be "strictly and narrowly interpreted," *id.*, and a "mere showing that the communication was from a client to his attorney is insufficient to warrant a finding that the communication is privileged," *Jax v. Jax*, 73 Wis. 2d 572, 581, 243 N.W.2d 831

---

[11] WISCONSIN STAT. § 905.03(3) provides:

WHO MAY CLAIM THE PRIVILEGE. The privilege may be claimed *by the client,* the client's guardian or conservator, the personal representative of a deceased client, or the successor, trustee, or similar representative of a corporation, association, or other organization, whether or not in existence. The person who was the lawyer at the time of the communication may claim the privilege but only on behalf of the client. The lawyer's authority to do so is presumed in the absence of evidence to the contrary.

(Emphasis added.) Here, Ms. Scholle did not invoke the privilege on Meeks's behalf. Instead, if Meeks invoked the privilege at all, he did so through trial counsel.

Although, conceivably, a rare individual who is incompetent to proceed still might be able to intelligently invoke the privilege with respect to communications with previous counsel, it is safe to assume that most would not. Thus, to protect a defendant's rights and to assure a defendant's opportunity to have a court consider whether the attorney-client privilege would apply, a court should appreciate that most defendants whose competency is at issue will only be able to invoke the attorney-client privilege through trial counsel.

(1976). "When determining whether a privilege exists, the trial court must inquire into the existence of the relationship upon which the privilege is based *and* the nature of the information sought." *Franzen*, 169 Wis. 2d at 386.[12]

¶ 34. Meeks implicitly concedes that Ms. Scholle's testimony did not relate any specific conversations she had with him. He offers authorities, however, that explain that, typically, an attorney's opinion about a client's competency could only come from information obtained, in large part, from privileged communications. *See, e.g., United States v. Kendrick*, 331 F.2d 110, 115 (4th Cir. 1964) (Sobeloff, J., concurring) ("Any expression as to the client's mental competency necessarily embrace[s] more than facts observable by anyone; it comprehend[s] conclusions drawn in the course of an association that is uniquely regarded in the law."); *Bishop*, 724 P.2d at 29 ("[I]t defies reality to pretend that the lawyer has formed opinions on competency without relying upon discussions with the defendant.").

---

[12] Meeks faults the circuit court for failing to "set forth its reasoning" in order to explain why Ms. Scholle's testimony did not violate the privilege. *See State v. Hydrite Chem. Co.*, 220 Wis. 2d 51, 64–65, 582 N.W.2d 411 (Ct. App. 1998) (where court failed to "set forth its reasoning for determining that the notes [prepared by party's attorney] were not privileged," appellate court "cannot conclude that [the circuit court] properly exercised its discretion"). As we have explained, however, Meeks's privilege-based, general "objection" was tentative, at best; it required no ruling and called for no statement of reasoning. *See* Majority at ¶ 28 n.10, above. Further, as we also have explained, Meeks's only specific privileged-based objection, while overruled, elicited an inconsequential response from Ms. Scholle. *See id.* Any error, therefore, in the court's failure to elaborate the basis for its ruling, was harmless.

We also recognize that, as Professor Uphoff observed, "[t]he protection of the attorney-client privilege is not limited only to the client's words but may include the client's nonverbal communications." Uphoff, *supra*, 1988 Wis. L. Rev. at 91 (footnote omitted).

¶ 35. Meeks, however, also acknowledges the substantial case law distinguishing impermissible testimony relating a client's statements from permissible testimony providing an opinion about the client's competency. *See, e.g., Darrow v. Gunn*, 594 F.2d 767 (9th Cir. 1979); *United States v. David*, 511 F.2d 355 (D.C. Cir. 1975); *Clanton v. United States*, 488 F.2d 1069 (5th Cir. 1974); *Howell v. United States*, 442 F.2d 265 (7th Cir. 1971); *United States v. Tom*, 340 F.2d 127 (2d Cir. 1965); *United States v. Kendrick*, 331 F.2d 110 (4th Cir. 1964); *Jones v. District Court*, 617 P.2d 803 (Colo. 1980); *People v. Kinder*, 126 A.D.2d 60 (N.Y. App. Div. 1987). For several reasons, we join this more substantial body of authority.

¶ 36. Although counsel—whether prosecution or defense—raise competency issues in adversarial settings, they remain officers of the court, obligated to assist the judicial effort to determine whether a defendant is competent to proceed. *See Nix v. Whiteside*, 475 U.S. 157, 168 ("[A]n attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct . . . ."). Therefore, in a very important sense, counsel *cooperate* in a court's effort to make one of the justice system's most fundamental findings—whether a defendant understands the proceedings and can assist in the defense. *See Kinder*, 126 A.D.2d at 63–64 (parties share a "compelling interest . . . in a correct determination of the issue of defendant's competency"); *see also Bishop*, 724 P.2d at 29 (adversarial

nature of proceeding diminished in competency hearing). And in a closely related way, counsel *cooperate* in the court's continuing effort to determine whether a defendant needs mental health assistance, and possibly medication, in order to function in a legal setting.

■

¶ 37. Thus, despite the intensity and competing interests of the adversarial setting, counsel must set aside strategic considerations and candidly assist the court's effort to determine whether a defendant is competent to proceed. As the supreme court declared, counsel's "considerations of strategy are inappropriate in mental competency situations." *Johnson*, 133 Wis. 2d at 221.[13]

¶ 38. Counsel need not relinquish their adversarial roles in order to fulfill their duties as officers of the court. In this area, contrary to what some might

---

[13] Professor Uphoff explains that, in this regard, the supreme court's conclusion is consistent with ABA Standard 7–4.2(c), which states, in part, that "[d]efense counsel should move for evaluation of the defendant's competence to stand trial whenever the defense counsel has a good faith doubt as to the defendant's competence." ABA STANDARDS FOR CRIMINAL JUSTICE Standard 7–4.2(c) (2d ed. 1986). He writes:

> The commentary [to ABA Standard 7–4.2] concludes . . . that the lawyer's duty to the court is paramount and overrides counsel's obligations to [his or] her client. At various points in the commentary, the drafters use slightly different language to justify this result. Defense counsel's independent professional responsibility toward the court and the fair administration of justice provide the initial justification. Later in the commentary, the drafters refer to the lawyer's duty to maintain the integrity of the judicial process as the basis for this disclosure requirement. Additionally, the drafters stress that this requirement also provides protection for the incompetent defendant by ensuring that defense lawyers do not deprive defendants of their personal rights to make fundamental case decisions.

have believed, their roles and duties are wholly compatible. No defendant is well served by the over-zealous attorney whose strategic efforts foster unneeded or inappropriate mental health commitment or treatment. *See Bishop*, 724 P.2d at 27 ("The usual defendant will always wish to be found not guilty . . ., but he [or she] may not always wish to be found incompetent to stand trial."). And by the same token, no defendant is fairly treated by the over-zealous prosecutor whose efforts force an incompetent defendant to stand trial or, ulti-

Rodney J. Uphoff, *The Role of the Criminal Defense Lawyer in Representing the Mentally Impaired Defendant: Zealous Advocate or Officer of the Court?*, 1988 WIS. L. REV. 65, 89 (footnote omitted).

Similarly, Professor Pizzi observes:

Although it is the court's responsibility to determine the issue of competency, counsel has the obligation, flowing from his duty to protect his client's rights, to see that the issue is decided correctly. As with the question of raising the competency issue, counsel is not free to chart an adversary course at the hearing based on his [or her] view of the client's best interests.

. . . .

[C]ounsel's obligation to protect the defendant's rights entails the duty to aid the court in making the correct competency decision and a court should be free to make such inquiry of defense counsel.

William Pizzi, *Competency to Stand Trial in the Federal Courts: Conceptual and Constitutional Problems*, 45 U. CHI. L. REV. 21, 58–59 (1977). *See also* James A. Cohen, *The Attorney-Client Privilege, Ethical Rules, and the Impaired Criminal Defendant*, 52 U. MIAMI L. REV. 529, 585 (1998) ("Only by permitting the defense attorney to testify about [his or] her client's inability to rationally communicate and assist in his [or her] defense, can the constitutional rights of incompetent clients be adequately protected.").

mately, to be incarcerated where essential mental health treatment may be unavailable. *See Johnson*, 133 Wis. 2d at 223 ("We start with the proposition that an incompetent may not be subjected to a trial."). Thus, in this rare instance, conscientious counsel must understand that their advocate hat and officer-of-the-court hat are one.

¶ 39. And just as defense counsel must be candid in expressing an opinion about a client's competency, courts, in turn, should understand that counsel's opinion derives, in substantial part, from confidential conversations with the client. Therefore, careful courts, under most circumstances, will give due weight to counsel's opinion without testing it with questions likely to expose the details of client conversations and other privileged communications.[14]

¶ 40. These principles logically apply not only to a defendant's trial counsel, but to prior counsel as well. In this case, interestingly enough, we have challenges, albeit contrasting ones, to the circuit court's treatment

---

[14] In this case, as typically is the case, Meeks's trial counsel offered his opinion on competency through his argument to the court; he did not testify in a formal sense. We see no problem with that. In this unique circumstance, counsel's officer-of-the-court role merged with his advocacy role. Quite properly, without hearing testimony from trial counsel in a conventional way, the court could consider counsel's opinion on Meeks's competency. As one court concluded:

> [I]n a competency hearing, the judge may call upon both counsel as officers of the court to provide whatever conclusions and opinions they may have, together with so much of the supporting facts as may be obtained without violating either the attorney-client privilege or the confidentiality provided to attorney's work product.

*Bishop v. Superior Court*, 724 P.2d 23, 29–30 (Ariz. 1986).

393

of the opinions of both trial counsel and prior counsel. Meeks claims inadequate consideration of trial counsel's opinion on competency, but too much consideration of prior counsel's testimony relating to that very issue. In this case, however, we conclude that the circuit court properly considered both. And in close cases, particularly where concerns about possible malingering may be present, a court's determination of competency may depend on the opinions of counsel, both present and prior.

¶ 41. Here, the court did not improperly consider privileged communications. Explicitly, Ms. Scholle did not relate any of her conversations with Meeks or testify about the substance of any other privileged communications. Implicitly, of course, she conveyed that she had had privileged conversations with Meeks about his cases, allowing her to conclude that, at the times she represented him, he was competent to proceed. But that conveyance is inevitable, and quite proper. *See* 3 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 503.14(4)(c), at 503–04 (2d ed. 2001) ("Courts generally permit an attorney to testify to the client's competency to stand trial when the testimony does not relate to confidential communications with the client, but instead relates to the attorney's observations of the client during the time of the communication.").

¶ 42. Ms. Scholle's testimony, in combination with the court's review of transcripts of some of those earlier proceedings, and together with the court's knowledge of Ms. Scholle's professional experience, was relevant to the determination of Meeks's current competency. Meeks has not established that the attorney-client

privilege precluded the court's consideration of Ms. Scholle's testimony. *See Franzen*, 169 Wis. 2d at 386.

### F. Conclusion

¶ 43. The supreme court has explained:

> [T]he trial court must weigh evidence that the defendant is competent against evidence that he or she is not. The trial court is in the best position to decide whether the evidence of competence outweighs the evidence of incompetence . . . . [T]he court must ultimately determine whether evidence that the defendant is competent is more convincing than evidence that he or she is not.

*Garfoot*, 207 Wis. 2d at 222–23. Here, in a particularly challenging case, the circuit court did so. It provided a factually comprehensive and legally solid hearing, and an analytically sound decision.

### III. DENIAL OF ADDITIONAL COMPETENCY HEARINGS

¶ 44. Meeks also argues that the circuit court erred in not ordering an additional competency evaluation and/or hearing when defense counsel again raised the competency issue before his guilty plea and, again, before sentencing. Again, we disagree.

¶ 45. As noted, a circuit court must conduct competency proceedings "whenever there is reason to doubt a defendant's competency to proceed." Wis. Stat. § 971.14(1)(a). The determination, however, of "[w]hether there is evidence giving rise to a reason to doubt competency is a question left to the sound discretion of the trial court." *Weber*, 146 Wis. 2d at 823.

And the determination is primarily a factual one; therefore, unless it is clearly erroneous, that determination will not be reversed. *See Garfoot*, 207 Wis. 2d at 224–25.

¶ 46. Denying Meeks's requests for additional competency evaluations and/or hearings, Judge Konkol referred to Judge Lamelas's competency determination and concluded that because Meeks had not offered anything to establish a change in his condition since that determination, no further competency evaluation or hearing was required. Judge Konkol's findings were not clearly erroneous; his conclusion was correct.

¶ 47. Meeks directs our attention to some of the developments in his case after Judge Lamelas determined competency—most notably, his entry of a special plea leading Judge Konkol to order additional evaluations and reports. We must detail those developments, and others as well, to determine whether the circuit court correctly concluded that no additional competency hearing was required before the entry of his guilty plea, and before his sentencing. We also must detail those developments in order to correct appellate counsel's gross misrepresentation of a critically important part of the record.

¶ 48. Judge Lamelas made the competency determination on January 4, 2000. On January 21, 2000, at Meeks's arraignment before Judge Konkol, defense counsel acknowledged Judge Lamelas's competency conclusion but advised: "I would still put my objection on the record to the continuation of the proceedings at this time. I understand the [c]ourt has made its ruling, but for the record I have to continue my objection." Judge Konkol then referred to Judge Lamelas's "Order on Competence," entered January 10, 2000, and asked, "Are you indicating that there's been some change since

that date or are you just continuing the objection?" Counsel responded: "I'm continuing my objection, your Honor. *I haven't seen any particular change in Mr. Meeks until this point.* Of course if there is any change, I would certainly bring it to the [c]ourt's attention . . . ." (Emphasis added.)

¶ 49. On Meeks's behalf, defense counsel then entered pleas of not guilty and not guilty by reason of mental disease or defect. As a result, at the conclusion of the arraignment, the court appointed Dr. John Pankiewicz, a psychiatrist, and Dr. Kenneth Smail, a psychologist, to examine Meeks for purposes of assessing the appropriateness of such a plea. *See* WIS. STAT. § 971.16(2). Additionally, as we will explain, defense counsel subsequently arranged for an examination by another psychologist, Dr. John V. Liccione.

¶ 50. By the time of the further proceedings of February 24, 2000, the court had received letters from Dr. Smail and Dr. Pankiewicz. While neither letter supported the special plea, Dr. Pankiewicz advised that he had "terminated the examination" because he had become "concerned regarding Mr. Meeks['s] competency to proceed." He added, "I understand competency has been adjudicated in the past few months[;] however[, I] believe it needs to be readdressed." As a result, defense counsel argued: "Your Honor, I would again formally raise competency based on [Dr. Pankiewicz's] letter . . . . I would ask that [Meeks] be re-examined for competency."

¶ 51. The prosecutor responded at length, summarizing for Judge Konkol the competency evidence that had been presented to Judge Lamelas, asserting that "[n]othing has changed in Mr. Meeks's situation from the time that competency finding was made 'til today," and arguing that "it's quite clear that Dr. Pank-

iewicz is really where we've already been in this case." Defense counsel offered nothing to refute the prosecutor's view. Judge Konkol then considered Dr. Pankiewicz's letter, carefully compared it to Dr. Smail's letter, and observed, in part:

> Interestingly enough, while Dr. Pankiewicz indicates his concern regarding Mr. Meeks'[s] competency to proceed and terminated the examination, he also recommended that Dr. Smail [who, previously, had also evaluated Meeks for competency] complete the evaluation and . . . compare his previous assessment prior to Mr. Meeks'[s] competency [commitment to] Mendota [Mental Health Institute] . . . . On February 23rd, Dr. Smail did in fact interview Mr. Meeks for one hour and thirty minutes and Dr. Smail, while again finding that there are problems with regard to mild mental retardation, apparently was able to conduct quite an interview . . . from which he did receive plenty of information from Mr. Meeks . . . provided in quite a competent manner, so I think that the concerns . . . that Dr. Pankiewicz had are even alleviated by the report that Dr. Smail has submitted subsequent to Dr. Pankiewicz where Dr. Smail does not raise any of those same concerns as Dr. Pankiewicz, so I think at this point the issue as to the competency really hasn't changed in that there's been nothing that's been changed on a factual basis[.] [I]t's . . . again, another doctor looking at the matter and saying, well, from a medical standpoint he has some questions with regard to competency, but from a legal standpoint those questions have been heard and considered and have been resolved in favor of competency[.]

Judge Konkol then adjourned the case for approximately one month, to allow Dr. Pankiewicz, or some other doctor, to complete a special plea evaluation.

¶ 52. Dr. Pankiewicz then completed Meeks's evaluation and, in his March 8, 2000 letter, advised the

court that he had found "no evidence to suggest that his mental illness or mental retardation was an exculpatory factor in his behavior." At the further proceedings of March 28, 2000, defense counsel requested a date for a projected guilty plea.

¶ 53. On April 5, 2000, the date scheduled for the guilty plea, defense counsel requested a brief adjournment because he wanted time to view a surveillance camera videotape of the offense with Meeks. The court granted counsel's request and also noted that it had received Dr. Pankiewicz's report. Although defense counsel offered no comment on the competency issue, the court recalled that Dr. Pankiewicz, in his first letter, had expressed "some concerns about [Meeks's] competency." The court then commented that Dr. Pankiewicz had completed his examination of Meeks, and had indicated "that he did have to explain items using simple terms, so that that apparently does require some slow going in order to get the understanding."

¶ 54. The next day, the court conducted a guilty plea proceeding that was commendably comprehensive and "slow going" where necessary to assure Meeks's understanding. The colloquy covered more than one hundred questions, many of which elicited substantive responses—far more than "yes" or "no." At the conclusion of the colloquy, however, defense counsel, in response to the court's inquiry as to whether Meeks understood the rights he was relinquishing by pleading guilty, answered that he was "still not satisfied." Defense counsel went on to offer examples of difficulties he had had in communicating with Meeks, and he took pains to explain that "[t]his is not some game to protect the appellate record," but rather, that he really had "serious doubts as to whether or not [Meeks] really understands his rights and the charges against him and

is making a knowing and intelligent waiver of his rights." Understandably, the prosecutor then advised the court that "with this record we have to set the matter for trial."[15]

¶ 55. At the status conference four days later, defense counsel again asked that Meeks "be re-examined." Presenting no new information, however, counsel only argued, "Based on my representation on the record and the court's action, I think that a re-examination is in order."[16] The court saw "no basis for that," denied the request, and scheduled a jury trial for July 10, 2000.

¶ 56. On July 6, 2000, however, the parties returned to court and Meeks again pled guilty. Before Meeks did so, however, Judge Konkol acknowledged the case's history of competency challenges and, once again, observed that "nothing actually has changed" since Judge Lamelas's competency determination. Although defense counsel maintained his continuing concerns about Meeks's possible incompetency, he clarified that Meeks did indeed want to plead guilty. And once again, the court conducted a commendably careful colloquy.

¶ 57. In Meeks's brief to this court, however, appellate counsel, with a specific record reference encompassing the twenty-five-page plea colloquy, writes:

---

[15] We note that throughout these proceedings, both the prosecutor and defense counsel appeared to appreciate their responsibilities as officers of the court. Defense counsel candidly conceded his uncertainties in trying to assess Meeks's competency, and the prosecutor, as this plea proceeding demonstrates, actively intervened to help protect Meeks's trial rights.

[16] Whether counsel was referring to a re-examination for competency or for Meeks's special plea is unclear. For Meeks's benefit in this appeal, however, we will assume that counsel was referring to competency.

> The Judge proceeded to ask Mr. Meeks a series of questions, *all answered "yes" or "no."* If Defendant said he could not understand the question, the judge asked simpler questions *until getting the one word answer. At no point anywhere i[n] this record was Defendant asked to explain anything in his own words. All of Defendant's responses were monosyllabic affirmations in response to grossly leading questions posed by Judge Konkol.*

(Emphases added.) The record, however, refutes this absolutely astounding misrepresentation. In addition to questions asked of counsel, the plea colloquy of July 6, 2000 included 133 questions of Meeks. Meeks answered: "Yes" or "Yeah" to seventy-four; "No" to twelve; and something other than "Yes," "Yeah," or "No" to forty-seven questions. And indeed, many of his answers were lengthy and substantive, unquestionably establishing his full and informed engagement in the plea proceeding.[17]

---

[17] A few examples of the court's questions and Meeks's answers, typical of the full plea proceeding, should suffice to confirm Meeks's active and informed participation:

Q: Did you also go over those [jury] instructions [on party to a crime, felony murder, armed robbery, and second degree reckless homicide] with your attorney?

A: Yes.

Q: Did you read the form and the instructions or did your attorney read them to you?

A: He read them to me.

. . . .

Q: What was [accomplice Fitzgerald] going to do with the gun?

A: I had no idea, because it was a toy gun.

Q: And what happened then after he went inside the store?

¶ 58. The court accepted Meeks's guilty plea. Specifically, in addition to making the required findings with respect to the free, voluntary, and intelligent

A: The door kind of flap[ped] open a little bit and that's when [accomplice] Zachary Hayes went in, went in the store.

Q: And Zachary Hayes went inside and so Mr. Fitzgerald and Mr. Hayes were both inside the store at that point?

A: Exactly.

Q: What did you do then?

A: Then I said like a couple minutes later I go in the store. That's when I seen them wrestlin' and tussling with the store owner.

Q: What did you do after you saw them tussling?

A: I helped.

Q: You hit the store owner?

A: I was wrestling with him. I didn't hit him.

We have searched the record, trying to locate any conceivable basis for appellate counsel's characterization of this record. We even pursued the possibility that counsel somehow confused the second plea proceeding with the first. But the record establishes that the court was equally careful, and Meeks was equally active, in the first plea proceeding as well.

We also note that appellate counsel was assisted by three law students. We value counsel's educational leadership and truly appreciate his willingness to be involved in appellate proceedings, with the active participation of students under his supervision. We may not, however, modify the standards of appellate practice for pedagogical purposes and, indeed, we must not mislead law students. They must understand the paramount importance of careful record review and representations, and accurate assertions to this court. Thus, we would be remiss if we failed to identify the appellate brief's gross misrepresentation of the record, particularly given its insulting distortion of Judge Konkol's exceptionally conscientious conduct of both plea proceedings.

nature of the plea, the court offered certain comments reflecting its appreciation of the competency concerns and its effort to carefully monitor Meeks's understanding of the proceedings:

> [I]n particular I feel that the defendant[,] as we've had this colloquy[,] has been able to express in his own words various ideas and that he has answered questions appropriately to the [c]ourt. The [c]ourt particularly was not asking questions that would always get yes answers from Mr. Meeks. Mr. Meeks was able to pick up on that and did answer no when no would have been the appropriate answer. He has again engaged in discussion with the [c]ourt. He's been able to talk with counsel while the matter has been here this morning and I feel he does actually understand what's involved in all of this.

Accordingly, the court set the case for sentencing.

¶ 59. The day before the sentencing of July 28, 2000, defense counsel submitted a report from Dr. John V. Liccione, a psychologist who had examined Meeks on May 26 and 31, and June 13, 2000. In his June 29 letter to defense counsel, Dr. Liccione observed that "a serious question of [Meeks's] mental competency to proceed in the trial is involved," and "strongly recommend[ed] a re-examination of his competency to stand trial be conducted at this time." Counsel advised the court that he felt he had to bring the letter to the court's attention "and raise competency one more time."

¶ 60. Counsel, however, did not allege any changes in Meeks's condition or new circumstances warranting another competency evaluation or hearing. He did not dispute the prosecutor's comment that "[defense counsel] would concede that between [the time of the competency hearing and the day of sentencing], there is nothing new." Nor did defense counsel

dispute the prosecutor's view that "especially ... if someone had been here during the guilty plea ... entered by Mr. Meeks, it would be impossible ... to conclude anything other than really total competency by Mr. Meeks."

¶ 61. The court agreed. Again, it summarized the evidence from the competency hearing, and then observed:

> Basically Dr. Liccione is reviewing what the other doctors['] reports had indicated, and coming up in fairly much the same situation as the other doctors. And I think it's interesting, again, he was looking at the N.G.I. aspect, and indicated while he did not find strong support that the defendant lacked substantial capacity to either appreciate the wrongfulness of his behavior or conform his conduct to the requirements of the law for reason of mental illness or defect, he believes there's a competency question in proceeding to trial in the matter . . . .
>
> . . . And, again, the report from Dr. Liccione presents nothing new other than the rehashing, again, things that the other doctors had brought up and that had been discounted by the [c]ourt.

Thus, the circuit court again found it unnecessary to conduct an additional competency hearing; it then sentenced Meeks.

¶ 62. The trial court was correct. As the details of these post-competency determination proceedings reveal, at each stage where counsel again raised the competency issue, Judge Konkol carefully compared the new psychiatric and psychological reports to the evidence that had come before Judge Lamelas. *Cf. State v. Fosnow*, 2001 WI App 2, ¶ 26, 240 Wis. 2d 699, 624 N.W.2d 883 (new expert opinion, based on facts avail-

able to previous expert, does not constitute "newly discovered evidence"). Judge Konkol continued to consider defense counsel's view. Judge Konkol continued to consider Meeks's demeanor and in-court communication. Trial counsel never presented anything to establish any substantial change in Meeks's condition or circumstances that would have altered Judge Lamelas's competency determination. Therefore, we conclude, Judge Konkol correctly denied the repeated requests for an additional evaluation and hearing.

*By the Court.*—Judgment affirmed.

¶ 63. FINE, J. (*concurring*). I agree with the result in this appeal but cannot join in the Majority Opinion for the reasons explained below.

¶ 64. The Majority opines that a trial court may consider the opinion of the lawyer representing a defendant at a competency hearing as to whether that defendant is competent. I disagree.

¶ 65. The general rule is that a lawyer may not testify as a witness in a proceeding at which he or she is representing one of the parties. SCR 20:3.7; *see Peck v. Meda-Care Ambulance Corp.*, 156 Wis. 2d 662, 670–673, 457 N.W.2d 538, 542–543 (Ct. App. 1990).[1] Thus, absent

---

[1] SCR 20:3.7 provides:

**Lawyer as witness. (a)** A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

405

the extraordinary circumstances mentioned in Rule 20:3.7, testimony at the competency hearing by Jerry J. Meeks's then-current trial lawyer would have been professional misconduct. No doubt, as the Majority opines, a defendant's lawyer who doubts the competency of his or her client must *raise* the issue, *State v. Johnson*, 133 Wis. 2d 207, 210–211, 395 N.W.2d 176, 178 (1986), but he or she may not give his or her *personal opinion* on the merits of the issue. SCR 20:3.4(e) (lawyer may not "state a personal opinion as to the justness of a cause"); *Younger v. Rosenow Paper & Supply Co.*, 63 Wis. 2d 548, 556–557, 217 N.W.2d 841, 845 (1974).

¶ 66. I also do not agree with the Majority's extended discussion in paragraphs 28 to 42. The attorney-client privilege does not protect all communications between a lawyer and his or her client, WIS. STAT. RULE 905.03(4); it only protects "confidential communications from the client to the lawyer, and from the lawyer to the client if disclosure of the lawyer-to-client communications would directly or indirectly reveal the substance of the client's confidential communications to the lawyer." *Borgwardt v. Redlin*, 196 Wis. 2d 342, 352–353, 538 N.W.2d 581, 585–586 (Ct. App. 1995). There has been no showing at all that the prior lawyer's testimony at the competency hearing revealed or tended to reveal confidential communications from Meeks to her during the course of her representation of him. *See Upjohn Co. v. United States*, 449 U.S. 383, 396 (1981) (attorney may not refuse to disclose relevant fact within his or her knowledge, unless that knowledge is

---

**(b)** A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

derived from a confidential client-to-attorney communication). For me, that ends the analysis.

¶ 67. For the foregoing reasons, although I agree with the result reached by the Majority, I cannot join in the opinion. Accordingly, I respectfully concur.